GERTRUDE MILLS ET AL., PLAINTIFFS, v. EAST WINDSOR
TOWNSHIP AND BOROUGH OF
HIGHTSTOWN, DEFENDANTS.

Tax Court of New Jersey

August 22, 1980.

*Ann Reichelderfer* for plaintiff (*Smith, Stratton, Wise & Heher*, attorneys).

*Harry Haushalter*, Deputy Attorney General, for defendant (*John J. Degnan*, Attorney General of New Jersey, attorney).

CONLEY, J. T. C.

This proceeding involves homestead tax rebates claimed by residents of a retirement community for the years 1977, 1978 and 1979. The retirement community, known as Meadow Lakes, is located in Mercer County, partly in East Windsor Township and partly in the Borough of Hightstown. Rebate applications were filed by approximately 350 residents of Meadow Lakes with the tax assessors of the two taxing districts for 1977 and 1978. All applications were denied. The denials were affirmed by the Mercer County Board of Taxation. In addition to their local applications for 1978, the residents filed separate applications with the Director of the Division of Taxation for 1978, and they did so again for 1979. He denied the claims for both years. Separate complaints were filed with the former Division of Tax appeals by each resident for each year seeking a review of the denials. The matters were consolidated and the Attorney General was permitted to intervene as a defendant with respect to all years. The entire proceeding was transferred to this court upon its establishment by the Legislature. *N.J.S.A.* 2A:3A–26. The issue presented by this litigation is whether the residents of the Meadow Lakes retirement community have a sufficient ownership interest in their respective residences to be entitled to homestead tax rebates for the years in issue.

The factual record was established at trial. The Meadow Lakes property consists of 103 acres, on which there are 30 one and two-story buildings containing 317 residential apartment units of various sizes. The physical property and other aspects of the retirement community are more fully described in *Presbyterian Homes v. Division of Tax Appeals*, 55 *N.J.* 275 (1970), in which the Supreme Court held that the Meadow Lakes property was not entitled to a local property tax exemption. The Presbyterian Homes of New Jersey, a nonprofit corporation, owns the land and buildings which comprise Meadow Lakes, including the buildings in which plaintiffs reside. The corporation itself receives all local property tax bills for the property from the East Windsor and Hightstown assessors, and each resident is then

billed by the corporation for his or her proportionate share of the taxes paid by the corporation for the entire property.

As a precondition to becoming a resident at Meadow Lakes, each plaintiff signed a residence agreement with Presbyterian Homes. The agreement is particularly significant in the present case. The agreement covers all aspects of residence in the retirement community and provides in part that the rights of the resident under the agreement "do not include any proprietary interest in the property or assets of the Corporation or any membership in the Corporation." The agreement also provides that Presbyterian Homes will provide total care to the resident for the rest of his or her life in return for the payment of an initial capital fee and subsequent monthly fees, unless the agreement is terminated under certain specified circumstances. Both the initial fee and each monthly fee are computed from actuarial tables and are revised periodically to meet the expenses of maintaining the corporation's facilities. In return for payment of the capital fee and monthly fees, residents receive full room and board and medical care. Their fees vary in accordance with the size of the apartment unit occupied by the resident. Medical care and long-term nursing care for the residents and for some nonresidents are provided on the premises in a 90-bed nursing unit known as the Medical Center. Each resident is also entitled to utilize certain common facilities furnished by the corporation, including dining rooms, lobbies, social and recreational rooms and outside grounds. The corporation provides each resident with specified services, including utilities, meals, laundering and general maintenance. Under the agreement the rights and privileges of the residents to the living accommodations, facilities and services are personal contractual rights which cannot be transferred, assigned or devised by the resident, and no person other than the resident can occupy the accommodations without the approval of the corporation.

The agreement contains several provisions pertaining to its termination and to the transfer of residents. For example, the corporation may terminate the agreement in the event a resi-

dent is unable to meet his or her monthly expenses. The agreement further permits either party to terminate the contract without cause and provides for automatic termination upon the death of the resident. In the event the agreement is terminated by reason other than death, a partial refund of the initial fee may be made by the corporation to the resident based upon an established formula. Finally, the corporation reserves the right under the agreement to transfer a resident permanently or temporarily to the corporation's infirmary, and in the event of a resident's mental or physical illness, the corporation may also permanently remove the resident to an outside institution.

At trial, plaintiffs presented the testimony of the vice-president for finance of Presbyterian Homes. He stated that in the 14-year history of Meadow Lakes it has been the intent of both new residents and the corporation that a resident will stay at and be cared for at Meadow Lakes for life. During the period only 95 residents of a total of approximately 900 have left the community during their lifetimes. One-third of these left when Meadow Lakes lost its tax exemption and two thirds left for a variety of personal reasons. The corporation has attempted to terminate the residency of only two individuals. The vice-president also testified that in a case of insufficient funds beyond the control of a resident, Presbyterian Homes and the resident have cooperated in an attempt to solve the problem, in some instances relying upon a residents' assistance fund created by *inter vivos* and testamentary gifts. At the time of trial, approximately six to eight residents were receiving assistance from the fund in order to pay their monthly fees. The total number of residents was approximately 400, and their average age was 82 years.

Plaintiffs have claimed homestead tax rebates pursuant to the following statutory language:

Every citizen and resident of this State shall be entitled, annually, to a homestead rebate on a dwelling house and the land upon which such dwelling house is situated, or on a dwelling house assessed as real estate situated on land owned by another or others which constitutes the place of his domicile and which is owned and used by him as his principal residence. . . . The said requirement of ownership shall be satisfied by the holding of the beneficial

interest where the legal title thereto is held by another for the benefit of the said citizen and resident, or for a resident shareholder in a cooperative or mutual housing corporation as defined herein.

A person who is a tenant for life or a tenant under a lease for 99 years or more . . . shall be deemed to be an owner for the purposes of this act. [*N.J.S.A.* 54:4–3.80 a]

Plaintiffs place primary reliance upon the term "tenant for life" in the second paragraph of the quoted language. They concede that they do not have "formal legal life estates in the Medford Lakes realty," but they contend that it was the intent of the Legislature to grant homestead tax rebates to residents of retirement communities whose rights are as set forth in the agreement between Presbyterian Homes and plaintiffs.

The Director contends that the Homestead Rebate Act must be strictly construed and that plaintiffs are not entitled to rebates because they do not fall squarely within the terms of the statutory language. The Director cites *Bloomfield v. Academy of Medicine of N.J.*, 47 *N.J.* 358, 363 (1966); *Pingry Corp. v. Hillside Tp.*, 46 *N.J.* 457, 461 (1966); *Princeton University Press v. Borough, Princeton*, 35 *N.J.* 209, 214 (1961). These cases all recite the following proposition:

The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function [citation omitted]. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption. The burden of proving a tax-exempt status is upon the claimant. [47 *N.J.* at 363]

This rule is particularly cogent in the context of local government finance and local property taxation. In that context finite local budgets are funded by revenues raised by the imposition of the requisite tax rate upon an existing ratable base. When the ratable base is reduced by virtue of the exemption of a property from taxation, the local tax rate must be increased so that the same amount of revenue will be raised from those properties that remain taxable. Exemption of any property from taxation in this context necessarily results in increased taxation for all other properties. Consequently, statutes granting exemption

from local property taxation must be strictly construed so as not to impose an inordinate burden on other properties.

The homestead tax rebate exists in a different context. It is not a tax exemption. The rebate program has no effect on local budgets or local tax rates. All property owners make their normal tax payments to the local tax collector. No local tax revenues are diverted to the State because of the rebate program, and local governments themselves receive no rebate payments. It is only when a homestead rebate application has been granted that rebate checks are issued to individual qualifying taxpayers. The actual payment is made by the State from gross income tax revenues on deposit in the Property Tax Relief Fund. *N.J.S.A.* 54A:9–25. Each fiscal year the homestead rebate program has been in effect the Legislature has included in the annual appropriations act "such additional sums as may be required . . . for additional payments to home owners qualifying for homestead [rebates]." *L.* 1977, *c.* 137, § 1 (account no. 77230); *L.* 1978, *c.* 60, § 1 (account no. 77230–240); *L.* 1979, *c.* 119, § 1 (account no. 77230–240); *L.* 1980, *c.* 56, § 1 (account no. 77230–240). The Homestead Rebate Act also included an appropriation of "such sums as may be necessary to carry out the provisions of this act through the period ending June 30, 1977." *L.* 1976, *c.* 72, § 15. In short, the Legislature has committed state monies to insure the payment of a homestead tax rebate to any qualified taxpayer who files a timely rebate application. It is therefore apparent that the grant or denial of a homestead tax rebate to any one taxpayer has no bearing on the tax obligation of any other taxpayer. Accordingly, the rule of statutory construction set forth in *Bloomfield v. Academy of Medicine of N. J., supra,* relied upon by the Director, is not applicable to the present case.

The appropriate rule of statutory construction to be applied to the Homestead Rebate Act is that of the "equity of the statute." This principle was explained in the following language in *Dvorkin v. Dover Tp.,* 29 *N.J.* 303 (1959);

   .  .  . [W]hen the lawgiver's intent is in doubt, the court "ought to interpret the law to be what is most consonant to equity and least inconvenient." *Kerlin's Lessee v. Bull,* 1 *Dall.* 175, 1 *U.S.* 175, 1 *L.Ed.* 88 (Sup.Ct.Pa.1786); *Associates of Jersey Company v. Davison,* 29 *N.J.L.* 415, 424 (E. & A. 1860). This is the doctrine of "equity of the statute" which found expression in *Eyston v. Studd,* 2 *Plowd.* 459 A, 75 *Eng.Rep.* (1574), and from which flows the constructional aid that has taken firm roots in our jurisprudence—that the spirit of the legislative direction prevails over its terms. *See Horack, Sutherland Statutory Construction* (3d ed. 1943), §§ 6001 to 6007; *McCaffrey, Statutory Construction,* § 4, p. 8 (1953).

   .  .  . the "equity of the statute" rule does not, when properly applied, substitute the judicial for the legislative will, but rather in the consideration of all the material elements reaches the result probably intended by the draftsman had he anticipated the situation at hand. [at 315]

This rule is especially pertinent with regard to statutes with "sweeping social objectives." *Jersey City Chapter, Property Owners', etc. v. Jersey City,* 55 *N.J.* 86, 100 (1969). *See N.J. Builders, Owners, etc., Ass'n v. Blair,* 60 *N.J.* 330 (1972). It is therefore necessary to examine the overall purpose and thrust of the homestead rebate program in order to determine how the Legislature would treat residents of retirement communities such as Meadow Lakes if the issue were squarely presented to that body.

Homestead tax rebates were first authorized in 1975 when the New Jersey Constitution was amended by the voters at a general election. The amendatory language provides:

The Legislature may adopt a homestead statute which entitles homeowners, residential tenants and net lease residential tenants to a rebate or a credit of a sum of money related to property taxes paid by or allocable to them at such rates and subject to such limits as may be provided by law. . . . [*N.J. Const.* (1947), Art. VIII, § 1, par. 5]

Pursuant to this authority the Legislature enacted the Homestead Rebate Act, *N.J.S.A.* 54:4–3.80 *et seq.,* and the Tenants' Property Tax Rebate Act, *N.J.S.A.* 54:4–6.2 *et seq.* Both acts were premised upon the anticipated passage of the New Jersey Gross Income Tax Act, *N.J.S.A.* 54A:1–1 *et seq.,* and the resulting property tax relief it would make available. *L.* 1976, *c.* 72, § 16; *L.* 1976, *c.* 63, § 2 b. Upon enactment of the gross income tax, the Legislature also provided for a credit against the tax for qualified residential tenants or shareholders in a cooperative

who were not eligible for a homestead rebate. *N.J.S.A.* 54A:4-3.

This comprehensive legislative scheme makes property tax relief available on a broad scale, in the form of homestead tax rebates to homeowners, property tax reductions to residential tenants and income tax credits to residential tenants. The implication is clear from all three acts that property tax relief was intended for the great majority of New Jersey domiciliaries. An indication of the breadth of the intended relief is evident from the exclusion from the Tenants' Property Tax Rebate Act of "hotels, motels or other guesthouses serving transient or seasonal guests," with the result that property tax reductions need not be passed on to transients or seasonal residents. *N.J.S.A.* 54:4-6.3 a. Indeed, the people of this State, in approving a constitutional amendment with regard to an income tax in 1976, conditioned the imposition of such a tax on a guarantee of property tax relief. The New Jersey Constitution now provides:

> No tax shall be levied on personal incomes of individuals, estates and trusts of this State unless the entire net receipts therefrom shall be received into the treasury, placed in a perpetual fund and be annually appropriated, pursuant to formulas established from time to time by the Legislature, to the several counties, municipalities and school districts of this State exclusively for the purpose of reducing or offsetting property taxes. [*N.J. Const.* (1947), Art. VIII, § 1, par. 7]

■ Given the stated concern of the people of New Jersey and their Legislature for property tax relief, and given the Legislature's open-ended appropriations to fund homestead tax rebates each year, this court concludes that the spirit of the Homestead Rebate Act adopted by the Legislature requires us to construe liberally the terms of *N.J.S.A.* 54:4-3.80 a dealing with substantive entitlement to homestead tax rebates. *But see, Horrobin v. Taxation Div. Director*, 172 *N.J.Super.* 173 (Tax Ct. 1979).

■ The present case deals with the entitlement of senior citizens to homestead rebates. The Legislature in recent years has been supportive of the needs and concerns of the State's senior citizens. Specifically with regard to taxation, the Legislature has granted additional benefits to senior citizens whenev-

er the Constitution has permitted such special treatment. The amounts of both the homestead tax rebate and the homestead credit against the gross income tax are substantially greater for senior citizens than for others. *N.J.S.A.* 54:4–3.81 a; *N.J.S.A.* 54A:4–3 a. In addition, senior citizens are entitled to a senior citizens' deduction against their property taxes if they meet the criteria for that benefit and make timely application for it. *N.J.S.A.* 54:4–8.40 *et seq.* In light of such favorable treatment, we conclude that if the Legislature had been faced squarely with the issue of whether residents at retirement communities would be entitled at least to some form of property tax relief, the response would be affirmative. Thus, the Homestead Rebate Act should be construed liberally because of the overriding legislative intent to make property tax relief widely available, and, in the present case, because the Legislature has demonstrated a clear concern that tax relief be provided to the State's senior citizens.

The history of the Homestead Rebate Act itself is also instructive in that the Legislature has only increased the availability of rebates and has never restricted them. The Legislature amended the act three times to make it clear that certain persons were intended to be granted rebates. The first amendment changed the designation of the available tax relief from that of an exemption to that of a rebate and extended it to

> . . . [a] person who is a tenant for life or a tenant under a lease for 99 years or more or a person who is entitled to and actually takes possession of the land and dwelling house under an executory contract for the sale thereof or under an agreement with a lending institution which holds title as security for a loan. . . . [*L.* 1977, *c.* 17].

Entitlement to a rebate was extended again by *L.* 1977, *c.* 241, and *L.* 1977, *c.* 242, to resident shareholders in a cooperative or mutual housing corporation. The Director correctly characterizes these amendments as "a progressive and deliberate broadening of the ownership concept by the Legislature to provide the rebate to selected owner-occupied principal residences." However, the Director argues that members of retirement communities even under these amendments do not have a sufficient

ownership interest in their residential units to qualify for a rebate.

The relationship between plaintiffs and Meadow Lakes as set forth in the residence agreement has been described by our courts as a "life care" contract. *Onderdonk v. Presbyterian Homes of N.J., Inc.*, 171 *N.J.Super.* 529 (App.Div. 1979), certif. granted 82 *N.J.* 303 (1980), and *American National Bank & Trust of N.J. v. Presbyterian Homes of N.J.*, 148 *N.J.Super.* 465 (App.Div. 1977). It is not disputed that Meadow Lakes is a "retirement" community in the ordinary sense of that term and that both the corporation and individual residents intend that their relationship will last throughout the life of each resident. Testimony in this case established that the average age of the residents was 82, so that experience seems to have borne out the original intent of the contracting parties.

These considerations oblige us to conclude that if the Legislature were to consider squarely the status of retirement community residents, it would treat them for purposes of the act the same as "tenants for life" and accordingly as eligible for the rebate. We so hold. In doing so we are aware that the residence agreement states that the rights of the resident "do not include any proprietary interest in the property or assets of the Corporation or any membership in the Corporation," and that the agreement may be terminated in a number of circumstances. We are also mindful of decisions holding that the residence agreement between Presbyterian Homes and plaintiffs "is not a lease and . . . the relationship thereby formed is not one of landlord and tenant."[1] *Onderdonk v. Presbyterian Homes of N.J., Inc.*, *supra*, at 542 and *American National Bank & Trust of N.J. v. Presbyterian Homes of N.J.*, *supra*, at 473–475. Nonetheless, retirement community residents such as

---

[1] These decisions would seem to preclude plaintiffs from taking credits against the New Jersey gross income tax as residential tenants. *N.J.S.A.* 54A:4-3.

plaintiffs in this case are by no means transient or seasonal residents of New Jersey. They have almost invariably sold their homes and invested their savings in a capital fee paid to the retirement community. These fees range from $20,000 to $65,-000. Plaintiffs and other residents of retirement communities certainly have more invested in their "homes" than do tenants of apartments, who at least would be entitled to homestead credits against the gross income tax. *N.J.S.A.* 54A:4-3. When the Legislature amended the Homestead Rebate Act to include resident shareholders in cooperatives and mutual housing corporations, the Governor upon signing the bills issued a statement that the legislation "recognizes that co-op owners should be treated as home owners in view of the substantial investment they have in their property." The same reasoning supports a determination that rebates should be made available to plaintiffs, who are domiciliaries of New Jersey and who reside in homes in which they have a substantial investment. Although plaintiffs do not possess an ownership interest in Meadow Lakes, the spirit of the Homestead Rebate Act indicates that they should be treated as owners for purposes of the act. Equity and common sense require this result.

No independent grounds for denial of homestead tax rebates to any plaintiff were raised by the Director. The denials of plaintiffs' rebate applications by the Mercer County Board of Taxation and the Director are reversed. The Clerk of the Tax Court will enter judgment granting a rebate to each plaintiff for each year for which a perfected appeal was filed.